367 F.Supp. 1158 (1973)
In re PENN CENTRAL SECURITIES LITIGATION.
Byron WILLIAMS et al.
v.
PENNSYLVANIA COMPANY et al.
M.D.L. Docket No. 56, Civ. A. No. 71-2838.
United States District Court, E. D. Pennsylvania.
November 19, 1973.
As Amended December 3, 1973.
*1159 *1160 *1161 *1162 Daniel L. Penner, Brooks, Tarlton & Gilbert, Arch B. Gilbert, Ben A. Douglas, Fort Worth, Tex., for plaintiffs.
Pelino, Wasserstrom, Chucas & Monteverde, Tom P. Monteverde, Philadelphia, Pa., O'Melveny & Myers, Warren Christopher, Donald M. Wessling, Los Angeles, Cal., for Pennsylvania Co.
Montgomery, McCracken, Walker & Rhoads, Joseph W. Swain, Jr., Philadelphia, Pa., for Peat, Marwick, Mitchell & Co.
Weil, Gotshal & Manges, Dennis J. Block, Peter Gruenberger, Neal A. Schwarzfeld, Peter D. Standish, New York City, for Glore Forgan Wm. R. Staats, Inc., Glore Staats Corp. and DuPont-Glore-Forgan, Inc.
Hall, Dickler & Howley, Milford Fenster, New York City, for Glore Forgan Staats & Co., and others.
LaBrum & Doak, Edward C. German, Philadelphia, Pa., for David C. Bevan.
Bolger & Picker, Steven R. Waxman, Philadelphia, Pa., for Stuart T. Saunders.
Saul, Ewing, Remick & Saul, Miles H. Shore, Philadelphia, Pa., for William R. Gerstnecker.
William P. Fonville, Dallas, Tex., Joseph R. Austin, Antonio Rossmann, Tuttle & Taylor, Inc., Los Angeles, Cal., Paul J. Bankes, Jr., Zink, Owens & Shinehouse, Philadelphia, Pa., for Great Southwest Corp.
Shearman & Sterling, New York City, for First National City Bank.
James W. Adelman, Adelman & Lavine, Philadelphia, Pa., for E. Clayton Gengras.
Lewis H. Van Dusen, Jr., Drinker Biddle & Reath, Philadelphia, Pa., for Paul A. Gorman and R. Stewart Rauch.
William L. Matz, Philadelphia, Pa., for Chase Manhattan Bank.
Seymour I. Toll, Philadelphia, Pa., for Charles Hodge.
Charles P. Storey, Storey, Armstrong & Steger, Dallas, Tex., for Angus Wynne, Sr.
John L. Hauer, Akin, Gump, Strauss, Hauer & Feld, Dallas, Tex., for Angus Wynne, Jr.
A. M. Herman, Brown, Herman, Scott, Dean & Miles, Fort Worth, Tex., for Amon Carter.
Patrick E. Higginbotham, Coke & Coke, Dallas, Tex., for Robert H. Stewart III.
Robert S. Travis, Cantey, Hanger, Gooch, Cravens & Munn, Fort Worth, Tex., for Murray Kyger.
J. Allen Dougherty, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for Murray Kyger and Robert H. Stewart III.
Michael I. Miller, Terry F. Moritz, Isham, Lincoln & Beale, Chicago, Ill., for James W. Pope and Charles S. Vrtis.
David Berger, David Berger, P. A., Philadelphia, Pa., Alfred S. Julien, Julien, Glasser, Blitz & Schlesinger, New York City, Liaison Counsel for plaintiffs.
Lewis H. Van Dusen, Jr., Drinker Biddle & Reath, Philadelphia, Pa., Liaison Counsel for defendants.

OPINION AND ORDER
JOSEPH S. LORD, III, Chief Judge.
Intervenor-plaintiffs Lawler and Foster ("plaintiffs"), who have filed a Second Amended Complaint on behalf of all plaintiffs, are shareholders of Great Southwest Corporation ("GSC").[1] Plaintiffs allege that defendants, by virtue of numerous acts and omissions, have violated §§ 10(b) and 14(a) of the Securities Exchange Act of 1934, 15 U. S.C. §§ 78j and n and Rules 10b-5 and 14a-9 promulgated by the Securities and Exchange Commission under those sections, 17 C.F.R. 240.10b-5 and 17 C.F.R. 140.14a-9, as well as § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and §§ 4 *1163 and 8 of the Clayton Antitrust Act, 15 U.S.C. §§ 15 and 19. They have also brought state law claims under the doctrine of pendent jurisdiction. Some of the claims asserted by plaintiffs are brought derivatively on behalf of GSC; others, for which they have moved for a class action determination, are brought by plaintiffs as purported representatives of a class of GSC shareholders.
This complaint is now the subject of several motions, either filed or joined in by most defendants, to dismiss pursuant to F.R.Civ.P. 12(b)(6) and 12(b)(1), to strike pursuant to F.R.Civ.P. 12(f) and for a more definite statement under F. R.Civ.P. 12(e) and Local Rule 45 of this court. Certain defendants have also moved to dismiss for lack of jurisdiction over the person, improper venue and insufficiency of process, F.R.Civ.P. 12(b)(2), 12(b)(3) and 12(b)(4).
The defendants named in the complaint are: Pennsylvania Company ("Pennco"), a wholly-owned subsidiary of the Penn Central Company; GSC, a Texas-based land development company; Glore Forgan Wm. R. Staats, Inc., an investment banking firm (now known as Glore Staats Corporation) and its alleged successor DuPont-Glore Forgan, Inc. (collectively referred to herein as "Glore"); Glore Forgan Staats & Company ("Glore Forgan Staats"), an Illinois investment partnership; 51 individual defendants who are or have been affiliated with Glore or Glore Forgan Staats, and/or have been distributees of their assets or of GSC capital stock obtained by Glore Forgan Staats as the result of an alleged merger between GSC and Macco Corporation ("Macco"), a California land development corporation, see infra, § III; 14 past directors of GSC; Peat, Marwick, Mitchell & Co. ("Peat, Marwick"), a public accounting firm which certified GSC's financial statements during the period relevant to this litigation; and two banks named only in connection with one common law fraud allegation.

I. Motion to Dismiss all Claims Brought Derivatively on Behalf of GSC for Failure to Comply with F. R.Civ.P. 23.1.
Defendants Gorman and Rauch, joined by defendants Carter, Kyger and Stewart, have moved to dismiss all of plaintiffs' derivative claims for failure to state with the particularity required by Rule 23.1 their reasons for not demanding that the GSC Board of Directors prosecute those claims.
Because "it is normally the directors, not the shareholders, who conduct the affairs of the company," In re Kauffman Mutual Fund Actions, 479 F. 2d 257, 263 (C.A.1, 1973), the directors not the shareholders, ordinarily conduct litigation on the corporation's behalf. In order that the directors may have the opportunity to perform their customary function, a shareholder seeking to press a claim on behalf of the company must first demand that the directors take the action desired. Only in circumstances where the demand would be futile or obviously unavailing is a shareholder excused from making such a demand. See generally Note, "Demand on Directors and Shareholders as a Prerequisite to a Derivative Suit," 73 Harv.L.Rev. 746 (1960); 3B Moore's Federal Practice ¶ 23.1.19 (2nd ed., 1969). It has long been settled law, now codified in Rule 23.1, that a shareholder who fails to make a demand on the directors must allege the reasons for his failure "with particularity." E. g., Hawes v. Oakland, 104 U.S. 450, 461, 26 L.Ed. 827 (1881).
Plaintiffs have not demanded that the directors bring the derivative claims. Their reasons for not demanding action, which moving defendants argue are not stated with sufficient particularity, appear in ¶ 7(c) of the complaint:
"[S]uch demand would be futile. Defendant Pennco has been, at all times material hereto, in complete control and domination of GSC, and its present president and chief executive officer, Victor H. Palmieri, also serves *1164 as president and chief executive officer of GSC. The domination and control of GSC by Pennco is one of the primary reasons for the injuries of GSC complained of herein, and thus any demand on a GSC Board of Directors dominated and controlled by Pennco would be futile. GSC officers and directors have failed and refused to disavow the acts herein complained of, and have sought to defeat Plaintiffs' claims, even those asserted on GSC's behalf."
Courts have generally been liberal in excusing demand and have normally applied to Rule 23.1 the flexible standards of modern notice pleading. Liboff v. Wolfson, 437 F.2d 121 (C.A.5, 1971); de-Haas v. Empire Petroleum Co., 435 F.2d 1223 (C.A.10, 1970). However, the First Circuit has recently rejected the liberal approach of other courts, choosing instead to construe Rule 23.1's requirement of particularity as a zone of specificity carved out of the world of modern notice pleading. In re Kauffman Mutual Funds Actions, supra.
"Rule 23.1 is not an ordinary, but an exceptional rule of pleading, serving a special purpose, and requiring a different judicial approach [than liberalized notice pleading sanctioned by F. R.Civ.P. 8]. * * * [I]t is clear that the `particularity' must appear in the pleading itself; the stockholder may not plead in general terms, hoping that, by discovery or otherwise, he can later establish a case." 479 F.2d at 263.
Even a full acceptance of the First Circuit's reading of Rule 23.1 does not, however, lead inexorably to dismissal of the derivative claims asserted here. The holding of Kauffman relevant to the complaint before us is that "[a]n allegation of domination and control, unsupported by underlying facts, does not satisfy the requirement of particularity." 479 F.2d at 264. [Emphasis in original.] In Kauffman the underlying facts not only did not support but directly contradicted the plaintiffs' allegations that the board of directors of the mutual funds on whose behalf the plaintiffs sought to sue was under the domination and control of certain investment advisers, named as defendants. The plaintiffs apparently claimed that the board was in the hands of directors affiliated with the defendant investment advisers; the court, however, found that there could not be such domination and control because it was "conceded" that "the self-interested, affiliated director-defendants constitute less than a majority of the membership of the board." Id. Although the First Circuit found the Kauffman complaint defective, it did not hold that simple allegations of domination and control are invariably insufficient. Such allegations, according to Kauffman, may meet the requirements of Rule 23.1 if facts are alleged in the complaint which lend support to the protestations of domination and control.
Underlying facts supporting plaintiffs' otherwise conclusory allegations of Pennco's domination and control of the GSC board do appear in the complaint before us and we conclude that plaintiffs have met the standards of Rule 23.1.[2] The dual service of Mr. Palmieri is not conclusive evidence that Pennco so controls the GSC directors that demand would be futile, since demand is to be made on the directors and not on the chief executive officer. It does suggest, however, that if the GSC directors would have their company run by the man who runs Pennco, the main defendant in this litigation, they would not be overly sympathetic with a shareholder demand that they also sue Pennco. The crucial fact alleged in the complaint, though, is that Pennco controls the vast majority of GSC's total voting *1165 stock. In 1964 Pennco came into control of over 80% of GSC's outstanding shares. (Complaint, ¶ 12). Although the complaint contains no allegations with respect to Pennco's current ownership and control of GSC stock, it is reasonable to infer especially for purposes of deciding whether a complaint may withstand a motion to dismiss, that Pennco retains control of a majority of GSC's voting stock.[3] A majority shareholder, particularly one owning a very substantial majority of the corporation's stock, has complete control of the selection of directors. The fact of Pennco's position as an overwhelmingly dominant shareholder is sufficient to support a conclusion that Pennco dominates the GSC board, whoever its members might be, and therefore that a demand on those directors to sue the stockholder that put them in their positions would be futile. What a judge said long ago in another case applies with equal force here: "Every sensible man, out of a court of justice, knows [that a demand under the circumstances] would never be complied with." Young v. Alhambra Min. Co., 71 F. 810, 812 (N.D.Ill.1895), quoted in 3B Moore's Federal Practice ¶ 23.1.19 at 23.1-255 (2nd ed., 1969).

II. Motions to Dismiss Count I
In Count I, plaintiffs seek treble damages under § 4 of the Clayton Act for harm suffered by GSC as the result of alleged violations by Pennco of § 1 of the Sherman Act and § 8 of the Clayton Act.
The facts alleged in Count I, and accepted for the purposes of a motion to dismiss, are these. In 1964 Pennco acquired 80.12% of the total voting stock of GSC. Shortly after Pennco acquired the GSC stock, defendants Saunders, Bevan and Gerstnecker, all officers and/or directors of Pennco and its parent, were placed on the GSC board of directors, as was defendant Hodge of Glore, who at the same time served as an investment adviser to Pennco and its parent, Penn Central Company. In 1965 Pennco acquired 99% of the total voting stock of Macco, which until then had been a closely held general real estate development company in California. Saunders, Bevan, Gerstnecker and Hodge were then placed on the Macco board, as was defendant Angus Wynne, Jr., who was also a director of GSC. Then in late 1965 or early 1966, Pennco gained control of 51% of the outstanding voting capital stock, as well as an option to purchase more, of Arvida Corporation ("Arvida") of Florida, yet another general real estate development company. Saunders, Bevan, Gerstnecker, Hodge and Angus Wynne, Jr. were then elected to the Arvida board.
Plaintiffs allege that Pennco, "aided and abetted by" Glore Forgan Staats (which owned the Macco stock not controlled by Pennco), Glore, and the past GSC directors, conspired to allocate markets, territories and customers among GSC, Macco and Arvida in violation of § 1 of the Sherman Act. Two allocations of territories and markets are alleged. The first is that Pennco, after acquiring more than 80% of GSC's stock and 99% of Macco's, forced GSC not to compete with Macco in California by ordering GSC to "deactivate" Great Southwest Pacific Corporation, a wholly-owned subsidiary it had formed to enter the California real estate development market. The second alleged territorial restraint was Pennco's instructions to GSC not to compete with Arvida in Georgia, where Arvida operated and where GSC had begun construction of a thematic amusement park, and in Florida, where GSC is alleged to have "reluctantly" been granted permission by Pennco to continue a previously established mobile-home manufacturing division on the condition that it engage in no other real estate development activities in Florida.
In moving to dismiss pursuant to F. R.Civ.P. 12(b)(6) for failure to state a *1166 claim, Pennco and the other moving defendants argue that these restrictions were no more than the lawful and proper internal management of a unitary business enterprise consisting of Pennco and its three subsidiaries. They contend that even if the territorial restrictions alleged here would be unlawful had they resulted from an agreement among three wholly independent companies, they are not violative of the Sherman Act if imposed by a parent upon its subsidiaries.
The question plaintiffs raise is not the normal intra-enterprise conspiracy problem, namely, whether a parent and its subsidiary or subsidiaries, acting jointly and directing their actions against outsiders to the corporate family, constitute the requisite multiplicity of actors necessary to form a conspiracy in restraint of trade and hence whether agreements between members of the corporate family directed against strangers are actionable under the Sherman Act. E. g., Kiefer-Stewart Co. v. Seagram & Sons, Inc., 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951); Timken Roller Bearing Co. v. United States, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951); see generally Willis and Pitofsky, "Antitrust Consequences of Using Corporate Subsidiaries," 43 N.Y.U.L.Rev. 20 (1969); Handler, "Through the Antitrust Looking Glass  Twenty-first Annual Antitrust Review," 57 Cal.L.Rev. 182 (1969). Here, no conspiracy directed at outsiders to the corporate family is alleged, either between a parent and its subsidiaries or between subsidiaries of the same parent. The allegations here amount instead to a charge that the parent Pennco, which through majority ownership of the stock of each, (a) instituted policies for its three real estate development subsidiaries which had the effect of restraining GSC from competing with Macco in California and Arvida in Georgia and Florida; and (b) was aided and abetted in this endeavor by the directors it had presumably installed on GSC's board and by Glore Forgan Staats, the owner of the Macco stock not owned by Pennco. The question here is whether Pennco's alleged allocation of territories and markets among its subsidiaries was merely internal management of a single business enterprise or was a conspiracy in restraint of trade in contravention of the Sherman Act. We conclude it was the former.
Pennco owned 99% of the common stock of Macco, over 80% of GSC's and 51% of Arvida's. Through this majority ownership it was able to elect the directors it desired and through them could put into action policies which would contribute to the corporate health of the whole Pennco enterprise. One of these policies was apparently the decision that it would be in the corporate family's best interest to have Macco operating in California, GSC mainly in Texas, and Arvida chiefly in Florida and Georgia. This decision involves the perfectly legitimate determination that it would not be in the best interests of the Pennco family to have each of its three subsidiaries competing against one another in every market in which any of them had previously operated. According to the allegations of the complaint, the other, vastly smaller, owner of Macco's stock agreed with this policy decision, as did the directors of GSC. We fail to see why this must be viewed as anything other than the normal internal management of a corporation which has chosen to operate through separately incorporated subsidiaries. The fact that this management decision resulted in GSC's not operating in California and carrying on limited activities in Georgia and Florida does not mean that there was a combination in violation of § 1 of the Sherman Act. As another court has said with regard to allegations that a decision between a parent and its wholly-owned subsidiary constituted a refusal to deal in contravention of § 1:
"Assuming that there were some discussions between [the parent] and [its subsidiary] which resulted in a refusal to sell to [plaintiff], the court cannot conclude that such discussions constitute a combination within the *1167 meaning of Section 1 of the Sherman Act or that they represent more than internal dialogue leading to a decision on the part of a single business unit." Beckman v. Walter Kidde & Co., 316 F.Supp. 1321, 1326 (E.D.N.Y.1970), aff'd 451 F.2d 593 (C.A.2, 1971), cert. denied, 408 U.S. 922, 92 S.Ct. 2488, 33 L.Ed.2d 333 (1972).
We do not mean to suggest in any way that agreements in restraint of trade between a parent and its subsidiary or between subsidiaries are beyond the purview of the Sherman Act. Various pronouncements of the Supreme Court, Perma-Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), Timken Roller Bearing, supra, Kiefer-Stewart, supra, make it clear that common ownership or control does not provide separately incorporated companies with immunity from the Sherman Act. But we need not enter the controversy of how extensive the reach of the antitrust laws may be, for that issue is not before us. All that we have here is a decision by a parent as to the conduct of its subsidiaries' businesses, which is not a § 1 violation.
We are of course mindful that summary procedures must be used sparingly in antitrust cases. Poller v. Columbia Broadcasting System, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). Here, though, the corporate structures and intercorporate relationships are fixed. And it is on the basis of that immutable situation that we hold as a matter of law that no claim under the Sherman Act is stated. Thus, it appears from the face of the complaint that no conceivable set of facts could be alleged which would state a claim for relief under the antitrust laws, and we can see little point to denying the motions to dismiss solely to permit plaintiffs to proceed with what would necessarily be extensive discovery in "the vague hope that something may turn up at trial." Perma Research and Development Co. v. Singer Co., 410 F.2d 572, 578 (C.A.2, 1969). Such an empty gesture would be particularly injurious to the speedy adjudication of the parties' rights in litigation as complex as this one, with each part inextricably interconnected with the others. Count I will be dismissed insofar as it seeks to state a claim under § 1 of the Sherman Act.[4]
Plaintiffs have also alleged that the simultaneous service of defendants Bevan, Saunders, Gerstnecker and Hodge on the boards of GSC and Macco[5] violated § 8 of the Clayton Act, which in relevant part provides:
"No person at the same time shall be a director in any two or more corporations, any one of which has capital, surplus, and undivided profits aggregating more than $1,000,000, engaged in whole or in part in commerce, * * * if such corporations are or shall have been theretofore, by virtue of their business and location of operation, competitors, so that the elimination of competition by agreement between them would constitute a violation of any of the provisions of any of the antitrust laws. * * *"
One of the grounds advanced by defendants in support of dismissal of Count I to the extent that it alleges a violation of § 8 is that GSC and Macco neither *1168 are nor have ever been competitors by reason of either business or location. This, however, is a question of fact which cannot be resolved on the basis of the pleadings at this time; it would therefore be improper to grant dismissal on that ground. We are also not persuaded, as defendants suggest, that § 8 was not meant to apply to interlocking directorates of subsidiary corporations of the same parent. Nothing in the legislative history of § 8, nor in the few cases decided under it, leads us to that conclusion. Nor do we find compelling the fact that some consent decrees agreed to by the government in § 8 cases have excluded from the operation of the decree interlocking directorates between a parent and its subsidiary.
However, we shall grant the motions to dismiss the § 8 allegations of Count I for the reason that our decision that there was no violation of § 1 of the Sherman Act, coupled with the fact that none of the directors now serves on either board, renders the § 8 claim moot.[6] No antitrust violation occurred while the defendants served on the two boards; therefore, no § 8 claim could have arisen from any actual violations of any antitrust laws during the period of simultaneous service. Were any of the defendants still serving on both boards injunctive relief might be appropriate, since § 8 was meant by Congress to be preventive: it is not necessary that a violation of the antitrust laws actually occur during the period of simultaneous service, but only that the relationship between the two companies be such that the "elimination of competition by agreement between them" would constitute a violation. See United States v. Sears, Roebuck & Co., 111 F.Supp. 614 (S.D. N.Y.1953). But they are not still serving. Their resignation would not automatically render the § 8 claims moot, United States v. Newmont Mining Corp., 34 F.R.D. 504 (S.D.N.Y.1964), but it is within the discretion of a district judge to determine that under all of the circumstances it does. United States v. W. T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). We doubt that in light of our disposition of the § 1 allegations we could do more than grant injunctive relief, for which plaintiffs have not asked. In any event, the four interlocking directors having apparently resigned from the GSC board[7] and given the circumstances of this case and the involvement of all four in the Penn Central securities litigation, we are convinced they will never again serve simultaneously as directors of GSC and Macco; and therefore the question raised in Count I under § 8 is moot.
The motion to dismiss Count I in its entirety will be granted.

III. Motions to Dismiss or For a More Definite Statement Directed to Counts II and III.

A.
In Count II, brought derivatively on behalf of GSC, plaintiffs allege violations of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 in connection with a merger between Macco and GSC. The defendants named in this Count are Pennco, Glore, Glore Forgan Staats, the past GSC directors and Peat, Marwick. All have moved to dismiss Count II pursuant to Rule 12(b)(6) or in the alternative for a more definite statement pursuant to Rule 12(e).
Shortly after Pennco's acquisition of virtually all of the common stock of Macco (referred to for purposes of this discussion as "Old Macco"), see supra § II, some members of GSC's management were placed at the top of Old Macco's managerial hierarchy. After the injection of GSC personnel into Old Macco, Old Macco's management devised, according to the allegations of the complaint, an intricate accounting formula which was designed to create an illusion of high earnings which in fact did not *1169 exist. Plaintiffs contend that this was done in part because of pressure from Pennco and in part because the Old Macco officers wanted to take advantage of the provisions of their employment contracts which provided contingent compensation to them for high earnings figures. Whatever the officers' motives in inflating the profit figures, plaintiffs allege that the end result of their scheme was that by early 1967 Old Macco was insolvent and unable to pay its debts as they matured without substantial cash advances from Pennco.
Despite this state of affairs, in 1968 Pennco, aided and abetted by at least some of the other defendants named in Count II, concocted a plan to bring Old Macco under the GSC corporate umbrella. This "scheme and merger," as plaintiffs call it, proceeded as follows. Pennco caused GSC to form a wholly-owned subsidary named BDG Realty, Inc. ("BDG"), into which GSC contributed shares of its capital stock worth $285.5 million. BDG then transferred the GSC securities to Pennco and to Glore Forgan Staats, the other owner of Old Macco stock, receiving in exchange all of the voting capital stock of Old Macco. Old Macco was then merged into BDG and thus ended its existence. BDG then changed its name to Macco Corporation ("New Macco") and continued operating precisely as Old Macco had, except that its operations, accounting and management were consolidated with GSC's.
Plaintiffs allege that defendants misrepresented or concealed numerous facts about Old Macco's financial condition and about the nature of this transaction. They ask that the merger agreement and issuance of GSC stock be rescinded or, in the alternative, for recovery of damages allegedly suffered by GSC.
GSC was not, under the facts alleged in Count II, a party to a traditional merger, which has been defined as
"* * * the absorption of one corporation by another, which retains its name and corporate identity with the added capital, franchises and powers of the merged corporation. It is the uniting of two or more corporations by the transfer of property to one of them, which continues in existence, the others being merged therein."
15 Fletcher Cyc. Corporations § 7041 (Rev.vol., 1961).
A traditional merger thus contemplates the disappearance of the merged corporation and the survival of only one corporation. The traditional merger here took place between Old Macco and BDG, with BDG (ultimately taking on the new name of Macco) the surviving corporation. GSC was not a party to this traditional merger.[8]
Plaintiffs urge, however, in response to the motion to dismiss, that we apply the de facto merger doctrine to this transaction, viewing it as having the practical and legal effect of a merger between Macco and GSC and thereby giving GSC a cause of action under § 10(b) and Rule 10b-5. The de facto merger doctrine is a device courts have used to treat transactions called acquisitions of shares or reorganizations, but which are in legal effect mergers, as de facto mergers. The primary purpose of the de facto merger doctrine has been to afford dissenting shareholders rights of appraisal which would be available under a statutory merger but of which they have been deprived simply because the merger is called something else. See Rath v. Rath Packing Co., 257 Iowa 1277, 136 N.W.2d 410 (1965); Farris v. Glen Alden Corp., 393 Pa. 427, 143 A.2d 25 (1958); Comment, 51 Iowa L.Rev. 1096, 1097 (1966). Plaintiffs have not cited, nor have we discovered, any reported decisions in which the de facto merger doctrine has been used for any other purpose.
*1170 That the concept of a de facto merger has until now been applied mainly to lawsuits by dissenting shareholders seeking rights of appraisal does not mean that it may be used only in that situation. We can discern no reason either in the origin of the doctrine or in the cases applying it why it should be so limited. The de facto merger doctrine is a judge-made device for avoiding patent injustice which might befall a party simply because a merger has been called something else. The deprivation of a corporation's right to sue under § 10(b) and Rule 10b-5 because the equivalent of a merger has been achieved by a roundabout transaction is as much an injustice as the deprivation of a shareholder's right of appraisal, and makes it necessary for a court to look at the substance of the transaction rather than its form. The broad antifraud goals of the securities laws must not be defeated simply because the artifices used to circumvent them are new or unusual. A. T. Brod & Co. v. Perlow, 375 F.2d 393 (C.A.2, 1967). We conclude that the purposes of the securities laws would be well served by examining what a transaction is rather than relying on what it is or is not called, and therefore apply the de facto merger doctrine to this 10b-5 claim.
Because we have concluded that the de facto merger doctrine may be applied to this situation, Count II must withstand the motion to dismiss. The allegations of Count II support either of two equally plausible conclusions. One is that the effect of the transaction was to make Macco a wholly-owned, closely controlled subsidary of GSC which retained a corporate identity separate from that of GSC. The other is that BDG was nothing more than a conduit for the transfer of Pennco stock to the owners of Old Macco and of Macco stock to GSC; that Macco's operations, management and accounting were so completely submerged in that of GSC that it lost its independent corporate identity; and that the legal effect of the transaction, despite the injection of BDG into it, was precisely that of a traditional merger. The allegations of Count II, while not exactly a model of clarity, are enough to suggest that a state of facts exists which might support the latter conclusion. Since "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957), we shall deny defendants' motion to dismiss Count II.[9]
The motion for a more definite statement will also be denied. The complaint, while not without its shortcomings, is not "so vague or ambiguous that [defendants] cannot reasonably be required to frame a responsive pleading." F.R.Civ.P. 12(e). The real basis of the Rule 12(e) motion is not so much that defendants are unable to respond as it is their assertions that plaintiffs refer to a "merger" between GSC and Macco when none took place. This was the ground argued and now disposed of in support of the motion to dismiss. In any event, whatever quarrel defendants may have had with plaintiffs' characterization of the transaction as a merger, they have been adequately put on notice of the nature of plaintiffs' allegations. The absence of a wealth of detailed factual allegations supporting plaintiffs' contention that a merger took place is also no ground for granting the motion for a more definite statement. The allegations of Count II satisfy the liberal *1171 requirements of F.R.Civ.P. 8, as is clearly demonstrated by defendants' full and excellent briefs, including a reply brief, in support of their motion to dismiss. Whatever additional facts they now desire may be had by the usual process of discovery.[10]

B.
Count III, brought under the doctrine of pendent jurisdiction, essentially restates Count II as a derivative mismanagement and breach of fiduciary duty claim under Texas law. Defendants' grounds for dismissal are all premised, in one way or another, on an assumption that a merger between GSC and Macco did not take place and that the result of the exchange of stock was simply that GSC created a new subsidiary. We have already concluded that a set of facts exists which, if proved, could support the view that the GSC-BDG-Macco transaction was a de facto merger of Macco into GSC. It is especially appropriate to apply the de facto merger doctrine to Count III where it is alleged, inter alia, that the dissenting shareholders were deprived of their rights of appraisal because of the form of the transaction. This, as we have noted, is precisely the factual setting to which the de facto merger doctrine has traditionally been applied. The motion to dismiss Count III will be denied, as will the motion for a more definite statement for the reasons we have discussed in denying the Rule 12(e) motion directed at Count II.

IV. Motions for a More Definite Statement of Count IV.
In Count IV, a shareholder's derivative action against Pennco and the GSC directors brought under § 10(b) and Rule 10b-5, plaintiffs allege that in 1968 Pennco induced GSC to enter into a tax allocation agreement under which GSC would be included as part of a consolidated Federal income tax return filed by Pennco and its affiliated corporations. The relevant feature of the agreement is apparently that in return for GSC's sharing in the net losses and carryovers of the consolidated group of companies, GSC would pay Pennco a charge in lieu of taxes equal to 95% of the tax GSC would have owed had GSC filed its own separate return. At the same time that the agreement was executed, Pennco allegedly "forced GSC to enter into transactions detrimental to the corporation." (Complaint ¶ 41) that would produce substantial book profits and hence tax liabilities which would increase the charges in lieu of income taxes. The complaint alleges that Pennco had made misrepresentations as to the fairness of the agreement to GSC and its minority shareholders, but even after the GSC directors discovered how unfair the arrangement really was, they authorized a distribution to Pennco of $3 million worth of securities to satisfy GSC's obligation to Pennco under the agreement.
Defendants contend that they cannot respond to the allegations of Count IV because they have no idea of what the "detrimental" transactions complained of are or even what their general nature might be. In their memorandum in response to the Rule 12(e) motions, plaintiffs concede that their allegations "may be somewhat conclusory" and refer to a number of other paragraphs of the complaint, not incorporated in Count IV, which they say sufficiently flesh out Count IV. We agree with defendants that the allegations of ¶ 41 are so vague and ambiguous as to prevent them from responding and fall short of even the very liberal requirements *1172 of notice pleading. The fact that plaintiffs have to refer to allegations outside Count IV and not incorporated therein to make Count IV intelligible is some indication of the need for greater specificity in the pleading of Count IV. See Krulikowsky v. Metropolitan District Council of Phila. and Vicinity, 30 F.R.D. 24, 26 (E.D.Pa.1962). We shall therefore grant the motions for a more definite statement with respect to ¶ 41.[11]

V. Motions to Dismiss Count V and Plaintiffs' Motion for Class Action Determination
Count V is a direct class action against Pennco, Glore, Glore Forgan Staats, the past GSC directors, GSC and Peat, Marwick, alleging many instances of fraud in violation of § 10(b) and Rule 10b-5. Plaintiffs have moved for a determination that Count V may proceed as a class action. Various defendants have moved to dismiss Count V on the grounds that (a) the complaint alleges no purchase or sale of securities in connection with which the alleged misrepresentations were made and (b) the named plaintiffs, not themselves purchasers or sellers, cannot represent a class of purchasers and sellers. The issues raised by plaintiffs' and defendants' motions may be treated together.
The requirement, first enunciated in Birnbaum v. Newport Steel Corp., 193 F.2d 461 (C.A. 2), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), that in order to have standing to sue under § 10(b) and Rule 10b-5 a person must be a purchaser or seller of securities, has withstood repeated onslaughts by non-selling or -purchasing plaintiffs seeking to maintain 10b-5 actions. The Third Circuit is the most recent Court of Appeals to consider the purchaser-seller requirement at length and, like every other circuit that has had occasion to deal with this question, has reaffirmed the basic vitality of the Birnbaum doctrine: "Buyer or seller status is indispensable in establishing liability for damages under rule 10b-5." Landy v. FDIC, 486 F.2d 139 (C.A. 3, 1973). See Mount Clemens Industries v. Bell, 464 F.2d 339 (C.A. 9, 1972) and cases discussed therein. This is not to say, of course, that only conventional purchases and sales may give rise to 10b-5 liability. The Supreme Court has cautioned that if the broad antifraud purposes of the Securities Exchange Act are to be given their full force, "Section 10(b) must be read flexibly, not technically and restrictively." Superintendent of Insurance v. Bankers Life & Casualty Co., 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971). Lower courts, both before and especially after Bankers Life, have held many transactions quite unlike a conventional purchase or sale to involve purchases and sales for the purposes of § 10(b) and Rule 10b-5.
In this case, intervenor-plaintiff Lawler purchased his shares of GSC common stock in November 1966; intervenor-plaintiff Foster bought his in May 1964 and September 1965. (Complaint ¶ 3). All purchases therefore occurred well before the misstatements and omissions they now complain of. They have never sold any of their GSC stock. They argue, however, in response to the motions to dismiss, that as a result of GSC's issuance of new shares of stock in connection with the GSC-Macco merger discussed supra and the distribution of those shares to Pennco and Glore Forgan Staats in exchange for Macco's outstanding common stock, their holdings of GSC stock were so diluted as to make them "forced sellers" of GSC securities. The question they raise is this: Does the issuance and transfer of new shares of common stock to another party so materially change the interests of those who are already shareholders as to render them § 10(b) sellers of securities?
*1173 In their attempt to bring themselves within the ambit of the purchaser-seller requirement, plaintiffs rely on the "forced-seller" doctrine of Vine v. Beneficial Financial Co., 374 F.2d 627 (C.A. 2), cert. denied, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967), and its progeny, placing special emphasis on the application of the forced-seller doctrine in Travis v. Anthes Imperial Limited, 473 F.2d 515 (C.A.8, 1973). Their reliance is misplaced. In Vine, the plaintiff was a shareholder who retained his stock in a corporation that had been merged into the defendant corporation, a merger which had been effected by a tender offer through which the defendant had acquired 95% of the shares in the class of stock held by the plaintiffs. Under the applicable state law the plaintiff and other minority shareholders who had kept their stock were forced to exchange their shares for cash, either by exercising their rights of appraisal or by accepting the defendant's cash offer. The Second Circuit held that even though he had not actually sold his stock, the plaintiff was a § 10(b) seller, saying:
"Since, in order to realize any value for his stock, appellant must exchange the shares for money from appellee, as a practical matter appellant must eventually become a party to a `sale,' as that term has always been used." 374 F.2d at 634.
Coffee v. Permian Corp., 434 F.2d 383 (C.A. 5, 1970), and Dudley v. Southeastern Factor and Finance Corp., 446 F.2d 303 (C.A. 5), cert. denied, 404 U.S. 858, 92 S.Ct. 109, 30 L.Ed.2d 101 (1971), both cited by plaintiffs, involved factual situations in which the assets of the plaintiffs' corporations had been substantially liquidated, thereby as a practical matter converting the minority stockholders' shares into a claim for cash and hence giving those shareholders § 10(b) seller status. Both courts found the cases before them undistinguishable in any important respect from Vine.
Plaintiffs place their greatest reliance on Travis v. Anthes Imperial Limited, supra. In Travis, the plaintiff-shareholders alleged that they had retained their shares in their corporation, whose stock was being acquired through a tender offer by the defendants, because the acquiring corporation had assured them that if they waited until the then-outstanding tender offer expired they would receive a more favorable offer for their shares. Plaintiffs retained their stock but the better offer was never made. Instead, the defendant, which by then had acquired 90% of the stock of plaintiffs' corporation, gave the plaintiffs a choice of cash payment for their shares or payment in cash plus shares in the defendant corporation. If the offer was not accepted, the defendant threatened immediately to withdraw market support for plaintiffs' stock, thereby eliminating an open market for it. The plaintiffs acceded and sold their stock to the defendants for cash. The Court of Appeals held that since the plaintiffs did in fact sell their stock they met the purchaser-seller requirement of § 10(b). The court went on to say, in what is clearly dictum in view of its holding that the plaintiffs were conventional sellers, that the plaintiffs also had standing under the forced-seller doctrine because after the defendant had eliminated the market for the plaintiffs' stock, the plaintiffs had no practical alternative but to sell their shares to the defendants for a consideration, either stock plus cash or cash.
It is readily apparent that plaintiffs' status as shareholders of GSC bears no discernible resemblance to that of any of the plaintiffs in the cases on which they rely. Even assuming, as we do, that GSC acquired Macco by a de facto merger, plaintiffs were never forced to exchange their shares for cash or any other consideration. They continued to hold stock in the same corporation, which had merely added the assets of another company to its own. Their corporation was and continues to be an ongoing enterprise whose assets have *1174 never been liquidated. No allegation has been made that their shares are no longer marketable, as was the case in Travis, but only that they have declined in value. The issuance of new shares of GSC stock and the transfer of those shares to Pennco and Glore Forgan Staats was strictly a matter of corporate management which, no matter how unwise it may have been and even if it "diluted" plaintiffs' proportional interest in their corporation, brought about no change in that investment which could conceivably be viewed as a sale, forced or otherwise, of securities.
We therefore conclude that neither plaintiff was a purchaser or seller of securities and hence both lack standing to bring a 10b-5 action themselves. Since they are not themselves purchasers or sellers, they may not represent the purported class.
"* * * [P]laintiff may not maintain this action on his individual behalf. And if he has no standing to sue on his own account, he may not maintain a class action on behalf of those stockholders who did sell their stock, because plaintiff is not a member of the class. Bailey v. Patterson, 369 U.S. 31 [82 S.Ct. 549, 7 L.Ed.2d 512] (1962); * * *." [Other citations omitted.] Greenstein v. Paul, 275 F.Supp. 604, 605 (S.D.N.Y.1967), aff'd 400 F.2d 580 (C.A. 2, 1968).
The motions to dismiss Count V will be granted and plaintiffs' motion for class action determination denied.[12]

VI. Motions to Dismiss Count VII and Plaintiffs' Motion for Class Action Determination
Count VII is a direct class action brought on behalf of all holders of GSC common stock other than defendants who have suffered losses since 1965. This Count alleges that Pennco, GSC, the past GSC directors and Peat, Marwick all participated in the preparation and distribution of proxy materials which contained numerous misstatements and omissions of material facts in violation of § 14(a) of the Securities Exchange Act and Rule 14a-9. The gravamen of this claim is that statements mailed to the shareholders in 1969 and 1970 failed to disclose details of the transactions and acts alleged in Counts I-V, supra; alleged conflicts of interest on the part of several GSC directors which "impaired their judgment," (¶ 57[g]); internal dissention among top management; and the alleged financial deterioration of GSC, which was concealed by the use of allegedly misleading financial statements.
The purpose of § 14(a) is to protect the integrity of the corporate voting process.
"The purpose of § 14(a) is to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitations. The section stemmed from the congressional belief that `[f]air corporate suffrage is an important right that should attach to every equity security bought on a public exchange.' H.R. Rep.No.1383, 73d Cong., 2d Sess. 13. It was intended to `control the conditions under which proxies may be solicited with a view to preventing the recurrence of abuses which . . . [had] frustrated the free exercise of the voting rights of stockholders.' Id., at 14. `Too often proxies are solicited without explanation to the stockholders of the real nature of the question for which authority to cast his vote is sought.' S.Rep.No.792, 73d Cong., 2d Sess., 12." J. I. Case Co. v. *1175 Borak, 377 U.S. 426, 431, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423 (1964). [Emphasis added.]
Unlike § 10(b), which is a general anti-fraud provision, § 14(a) is aimed only at misleading statements and omissions which distort the voting process and which might affect a shareholder's decision on how he will cast his vote. Therefore, in order to make out a cause of action under § 14(a) a plaintiff must allege an injury resulting from the infringement of his corporate suffrage rights. If he alleges that he was injured by a corporate transaction, that transaction, if it is to give rise to a § 14(a) claim, must have been approved on the basis of misleading proxy material. In re Penn Central Securities Litigation, 347 F.Supp. 1327, 1341-1342 (E.D.Pa. 1972); Hoover v. Allen, 241 F.Supp. 213 (S.D.N.Y.1965). See also Robbins v. Banner Industries, Inc., 285 F.Supp. 758, 762 (S.D.N.Y.1966).
Count VII fails to satisfy these criteria and therefore must be dismissed. Nowhere in Count VII is there any allegation of any injury to plaintiffs' corporate suffrage rights or to those of the shareholder class they seek to represent. Even an extremely liberal reading of Count VII fails to disclose such an allegation. In their response to the motions to dismiss, plaintiffs suggest (if we understand their argument) that the GSC-Macco merger should have been submitted to the shareholders for their approval and since it was not, the shareholders were denied their rights of appraisal, a denial which somehow makes proxy material touching on the merger false and misleading. Even assuming, as we do not, that this argument rests on a sound foundation, it would still be impossible for plaintiffs to prove a set of facts to support a § 14(a) claim. The proxy materials at issue here were mailed to the shareholders, according to the complaint, "on or about April 11, 1969 and April 22, 1970." (¶ 56). The 1969 proxy solicitation was therefore made approximately two months after the consummation of the GSC-BDG-Macco transaction and the 1970 solicitation over a year after the alleged merger. See supra, § III. It is therefore totally impossible for the merger to have been approved as a result of the misleading proxy statements. Therefore, even if plaintiffs were able to prove every allegation in Count VII, they would still not have established any causal connection between the alleged misstatements and an infringement of their corporate suffrage rights. If that connection does not exist, it makes no difference for the purposes of § 14(a) that the misstatements happened to appear in a proxy statement. "The fact that the piece of paper upon which the allegedly misleading statements appeared was a proxy statement is irrelevant to the damage claimed." Hoover v. Allen, supra, 241 F.Supp. at 230. The motions to dismiss Count VII will be granted.[13]

VII. Count VI
Count VI incorporates the allegations of Counts I-V and asserts them, under the doctrine of pendent jurisdiction, derivatively on GSC's behalf as common law claims for breach of fiduciary duty, mismanagement and waste and dissipation of GSC's corporate assets. The defendants named in this Count are Pennco, Glore, Glore Forgan Staats, the past GSC directors, Gorman, Gengras, Rauch, First National City Bank, Chase Manhattan Bank, N.A. and Peat, Marwick.

A. Pennco

Pennco and others joining in its motion have moved pursuant to F.R.Civ. P. 12(b)(1) for dismissal for lack of *1176 jurisdiction over the subject matter or, in the alternative, to strike pursuant to F.R.Civ.P. 12(f) allegations they contend are rendered immaterial by the dismissal of other claims. However, although they suggest that the dismissal of any federal claim would necessitate the striking of the corresponding claims in Count VI, moving defendants correctly point out that it is impossible intelligently to argue the striking of parts of Count VI before they know which federal claims survive. Plaintiffs appear to take the same position. We agree, and adopt defendants' suggestion that after receipt of the order accompanying this opinion the parties submit additional memoranda on Count VI.

B. Gorman, Rauch and Gengras

Defendants Gorman and Rauch, joined by defendant Gengras, have moved for the dismissal of Count VI as to them. Their names appear nowhere in the complaint save in ¶ 53, the last paragraph of Count VI, which alleges that they and the two banks, along with at least some of the other named defendants, were responsible for an alleged $700,000 loss suffered by GSC as a result of the sale of some of its land in 1970 to one buyer, despite the fact that other buyers allegedly would have paid more. There are no federal claims against these defendants.
The courts are divided on whether the doctrine of pendent jurisdiction gives a federal court the power to entertain a pendent state claim against a party not named in any federal claim in the complaint. Some courts have held that a federal court's pendent jurisdiction does not extend so far. E. g., Williams v. United States, 405 F.2d 951 (C.A. 9, 1969); Jennings v. Davis, 339 F.Supp. 919 (W.D.Mo.1972); Barrows v. Faulkner, 327 F.Supp. 1190 (N.D.Okl.1971). The Second Circuit, however, has held that a federal court has the power to entertain a state claim against a defendant not named in a federal claim, applying the standards enunciated in United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Leather's Best, Inc. v. S. S. Mormaclynx, 451 F.2d 800 (C.A. 2, 1971); Astor-Honor, Inc. v. Grosset & Dunlap, Inc., 441 F.2d 627, 629 (C.A. 2, 1971). The Supreme Court was recently presented with this question in Moor v. Alameda County, 411 U. S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973) but found it unnecessary to decide it.
We need not attempt to resolve this thorny dispute, for it is clear that even assuming that we had the power in the abstract to entertain a state claim against parties not named in the federal claims, we cannot hear the claim asserted against moving defendants in ¶ 53 as a pendent claim because it does not "derive from a common nucleus of operative facts" with any of the federal claims and is therefore not a claim which plaintiffs would ordinarily be expected to try in one proceeding with the federal claims. United Mine Workers v. Gibbs, supra, 383 U.S. at 725, 86 S.Ct. 1130.
The land transaction alleged in ¶ 53 is in no way related to the acts or transactions alleged anywhere else in the complaint. The land sale has nothing to do with the facts underlying the alleged allocation of customers and territories, the GSC-Macco merger, the tax allocation agreement, or any of the various omissions and misstatements allegedly made by any of the defendants. Along with this difference of character, there is an added, and important, difference of time: the ¶ 53 land sale occurred in 1970, while every other act alleged in the rest of the complaint other than the mailing of a proxy statement not relevant here took place during or before 1969. The claim in ¶ 53 is entirely separate and one which would ordinarily be tried in the state courts. That is where it should go if plaintiffs wish to pursue it. We grant the motion to dismiss Count VI as to defendants Gorman, Rauch and Gengras.

*1177 VIII. Motion of Defendants Carter, Kyger and Stewart

Most of this motion to dismiss, for a more definite statement and to strike relates to the issues with which we have already dealt. However, these defendants also assert as a ground for dismissal of the complaint as to them that venue would be improper and service of process insufficient were this case to be tried in any district other than the Northern District of Texas. F.R.Civ.P. 12(b)(3) and 12(b)(4). Since this litigation is before us for pretrial purposes only and we do not at this time contemplate transferring it to this district or any other but the Northern District of Texas for trial, this motion is nothing more than an invitation into the realm of the subjunctive which we choose to decline. We shall express no opinion whatever on the substance of movants' arguments and shall deny the motion without prejudice insofar as it is grounded on arguments as to venue and service of process asserted under Rules 12(b)(3) and 12(b)(4). In all other respects it will be denied and granted in accordance with the foregoing portions of this opinion.

IX. Motion of Defendant Angus Wynne, Sr.
This motion, again, addresses itself for the most part to the questions of which we have already disposed. In addition, Wynne argues that the complaint should be dismissed as to him because under the GSC bylaws he will be indemnified by the corporation and a judgment against him would be "pointless," since the corporation would in any event have to pay the judgment and his costs. To support this contention Wynne does no more than quote the purportedly relevant provision of the bylaws. Since this argument goes entirely beyond the four corners of the complaint, it must be treated, if at all, as a motion for summary judgment. But because there are no affidavits in support of the motion and, in fact, nothing but the bare quotation from the bylaws, we cannot treat it as a 12(b)(6) motion turned motion for summary judgment. If Wynne desires to press this contention in the form of a motion for summary judgment, he may of course do so by following the normal procedures prescribed by F.R.Civ.P. 56. We express no opinion on the merits. The motion will be denied and granted in accordance with the preceding discussion.

X. Motions of Defendants Pope and Vrtis
Pope and Vrtis are former partners of Glore and, by virtue of that partnership, were also partners of Glore Forgan Staats. The only mention of them in the complaint is in ¶ 5(d), which does no more than list the names of individual defendants who are or were partners of Glore Forgan Staats and/or Glore and/or distributees of assets of those companies and/or distributees of the GSC capital stock which was transferred to Glore Forgan Staats in the GSC-Macco merger. Pope and Vrtis have moved to dismiss the complaint for want of proper venue as to them in the Northern District of Texas. Their argument in essence is that plaintiffs have alleged wrongful acts on the part of Glore Forgan Staats which were beyond the scope of the partnership agreement and that a partner is not liable for such acts of his partnership; that the allegations against defendant, Hodge, who allegedly acted as the partnership's agent in Texas, similarly do not give rise to liability on the part of Pope and Vrtis absent later ratification of the wrongful acts; and that venue does not lie under the special venue provision of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, because there is no connection between either defendant and any "act or transaction constituting the violation" that occurred in the Northern District of Texas.[14] Affidavits relating to the partnership *1178 agreement and these defendants' alleged lack of involvement in the conduct of the partnership's affairs have been submitted in support of the motion.
The motion and the affidavits supporting it make reference to matters dehors the pleadings. This is therefore properly a motion for summary judgment; we shall treat it as such. Plaintiffs may submit any affidavits they think appropriate in opposition in accordance with the timetable specified in the accompanying order.

ORDER
And now, this 19th day of November, 1973, it is ordered as follows:
1. Defendants' motions to dismiss Count I are granted.
2. Defendants' motions to dismiss Count II or in the alternative for a more definite statement are denied.
3. Defendants' motions to dismiss Count III or in the alternative for a more definite statement are denied.
4. Defendants' motions for a more definite statement of the allegations of Count IV are granted insofar as they seek a more definite statement of the allegations of ¶ 41 and denied in all other respects.
Plaintiffs shall file a more definite statement within ten (10) days of the receipt of this Order.
5. Defendants' motions to dismiss Count V are granted.
6. Defendants' motions to dismiss Count VII are granted.
7. The motion of defendants Gorman, Rauch and Gengras to dismiss Count VI as to them is granted.
8. The motion of defendants Carter, Kyger and Stewart to dismiss the complaint on the grounds of improper venue and insufficiency of process is denied without prejudice to their right to renew it should it later become appropriate. In all other respects it is granted and denied in accordance with this Order.
9. The motion of defendant Angus Wynne, Sr. to dismiss the complaint as to him on the ground that he will be indemnified by Great Southwest Corporation is denied. In all other respects defendant Wynne, Sr.'s motion is granted and denied in accordance with the balance of this Order.
10. The motion to dismiss of defendants Pope and Vrtis shall be treated as a motion for summary judgment. Plaintiffs shall file any affidavits they deem appropriate in opposition to the motion within ten (10) days of the receipt of this Order.
11. Defendants may submit further memoranda of law on their motions to dismiss Count VI. Such memoranda shall be filed within ten (10) days of receipt of this Order. Plaintiffs' memoranda in response shall be filed within ten (10) days following receipt of defendants' memoranda.
12. The motion of defendants Gorman and Rauch, insofar as it moves to dismiss all claims brought derivatively for failure to comply with F.R.Civ.P. 23.1, is denied.
13. Plaintiffs' motion for class action determination is denied.
NOTES
[1] We have this and other Penn Central securities cases for pretrial purposes pursuant to an Order of the Judicial Panel on Multi-district Litigation under 28 U.S.C. § 1407.
[2] The complaint must be read as a whole to determine whether the particularity requirement of Rule 23.1 has been satisfied. Citrin v. Greater New York Industries, Inc., 79 F. Supp. 692, 697 (S.D.N.Y.1948). The underlying facts may therefore appear in paragraphs of the complaint other than that alleging domination and control of the board by interested defendants.
[3] Plaintiffs apparently meant to allege, and evidently think that they have, that Pennco now owns 92.15% of GSC's total voting stock. See Plaintiffs' Memorandum in Support of Their Motion for Class Action and Derivative Determination, etc., at 6.
[4] It may well be, as plaintiffs indirectly suggest, that the interests of the minority shareholders were adversely affected by Pennco's decision to operate its three subsidiaries as it did. But an injury to the personal interests of minority shareholders is not actionable under the antitrust laws. Deaktor v. Fox Grocery Co., 475 F.2d 1112 (C.A.3, 1973); Kauffman v. Dreyfus Fund, Inc., 434 F.2d 727 (C.A.3, 1970), cert. denied 401 U.S. 974, 91 S.Ct. 1190, 28 L.Ed.2d 323 (1971). The state courts are the proper forum for such a complaint; a derivative suit on the corporation's behalf under the federal antitrust laws is not.
[5] The complaint alleges that the simultaneous service of some of the individual defendants on the boards of GSC and Arvida also violated § 8. In their answering memorandum to the motions to dismiss they abandon that contention, conceding that GSC and Arvida were not competitors for the purposes of § 8.
[6] We assume, arguendo, that GSC and Macco were competitors.
[7] The complaint refers to them as "past directors" (¶ 5 [e]) and only alleges that they served until 1970 (¶¶ 12, 17).
[8] The fact that various documents put out by Pennco and GSC referred to a "merger" between GSC and Macco has no bearing on our interpretation of this transaction, although plaintiffs claim that it does. "There is no magic in the words applied to the transaction. Calling it a merger does not necessarily make it so and giving it another name does not prevent it from being a merger." Fidanque v. American Maracaibo Co., 33 Del.Ch. 262, 92 A.2d 311 (1952).
[9] There appears, and ought to be, no dispute that a traditional merger between GSC and Macco would be a 10b-5 purchase or sale and would have given rise to a derivative cause of action on behalf of GSC. Dasho v. Susquehanna Corp., 380 F.2d 262 (C.A.7), cert. denied sub nom. Bard v. Dasho, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 470 (1967); H. L. Green Co. v. Childree, 185 F.Supp. 95 (S.D.N.Y.1960); 1 A. Bromberg, Securities Law: Fraud § 6.5(2) at 138-138.3 (1971). A de facto merger such as the one alleged here has, as we have held, the same effect on plaintiffs' standing to bring a derivative action under § 10(b) and Rule 10b-5 on behalf of GSC.
[10] It is questionable whether a court may ever properly grant a motion for a more definite statement if it determines that the complaint is sufficient to withstand a motion to dismiss. "In view of the great liberality of F.R.Civ.P. 8, permitting notice pleading, it is clearly the policy of the Rules that Rule 12(e) should not be used to frustrate this policy by lightly requiring a plaintiff to amend his complaint which under Rule 8 is sufficient to withstand a motion to dismiss." Mitchell v. E-Z Way Towers, 269 F.2d 126, 132 (C.A.5, 1959).
[11] The motion will of course be denied insofar as it is directed at ¶ 39, which incorporates the allegations of Count II relating to the GSC-Macco merger, in view of our disposition of the motion for a more definite statement directed at Count II.
[12] Plaintiffs argue in their memorandum in opposition to the motions to dismiss that even if we conclude that they lack standing to maintain a 10b-5 action, Count V should not be dismissed. Rather, they say, we should permit "qualified representatives" to intervene and "adopt" the class action allegations. We firmly reject the notion that a motion to dismiss may properly be denied for the sole purpose of permitting persons to embark on an odyssey to find a new parent for their orphaned class action allegations.
[13] Our dismissal of Counts V and VII makes it unnecessary for us to pass on the contention of defendant GSC that plaintiffs, because of the potential for conflicts of interest, may not both sue derivatively on GSC's behalf and represent a class suing GSC.

Plaintiffs' motion for class action determination will of course be denied as to Count VII now that Count VII itself has ceased to exist.
[14] Our dismissal of Count I makes it unnecessary for us to deal with these defendants' arguments that they may not be sued under the special venue provision of the Clayton Act.