589 F.2d 451
 1979-1 Trade Cases 62,465, 25 UCC Rep.Serv. 993
 Clyde E. HARVEY and Neil J. Nielsen, co-partners doing
business under the name of U-Serve Gas Company,
Plaintiffs-Appellants,
v.
FEARLESS FARRIS WHOLESALE, INC., Fearless Farris Service
Stations, Inc., Fearless Farris, Southern, Inc., Fearless
Farris, Western, Inc., Fearless Farris of Burley, Inc., and
Fearless Farris of Twin Falls, Inc., all being Idaho
Corporations, Defendants-Appellees.
 No. 77-2442.
 United States Court of Appeals,
Ninth Circuit.
 Jan. 10, 1979.
 
 Herbert W. Rettig (argued) of Rettig, Rosenberrg & Roberts, Caldwell, Idaho, for plaintiffs-appellants.
 Ronald G. Carter (argued) of Carter, Gines & Rice, Boise, Idaho, for defendants-appellees.
 Appeal from the United States District Court for the District of Idaho.
 Before VAN DUSEN,* WRIGHT and GOODWIN, Circuit Judges.
 VAN DUSEN, Circuit Judge.
 
 
 1
 This dispute arose during a nationwide gasoline shortage in 1973. The appeal from summary judgment in favor of defendants raises these questions:
 
 
 2
 A. Does the evidence show a conspiracy in restraint of trade, in violation of 15 U.S.C. § 1, on the part of corporations, all of which were wholly owned and controlled by a single person?B. Did an enforceable oral contract of sale exist between the parties, so as to require the seller to allocate a portion of its supplies to the buyer during the period of shortage?
 
 
 3
 C. Was summary judgment improper on this record?
 
 
 4
 The district court answered these questions in the negative.[1]
 
 I. HISTORY OF THE CASE
 
 5
 In 1972-73, Clyde E. Harvey and Neil J. Nielsen, plaintiffs-appellants in this case, were partners in retail gasoline service stations, doing business as U-Serve Gas Company ("U-Serve"). Defendant-appellee Fearless Farris Wholesale, Inc. ("Wholesale") was a wholesaler of petroleum products and is wholly owned by Farris C. Lind. The other five named corporate defendants-appellees were retail gasoline service station companies ("Retail Companies"), also wholly owned by Lind.
 
 
 6
 Wholesale formerly sold its products both to the Retail Companies and to unaffiliated retailers, including U-Serve. Then the fuel shortage of 1973 set in. Beginning in January 1973, Wholesale reduced deliveries to U-Serve; later in that year Wholesale completely cut off U-Serve and six other retail customers, which included J. C. Penney Co., the Seven-Eleven chain, and Circle K. In February 1974, under the federal government's mandatory allocation program, deliveries were partially restored.
 
 
 7
 Plaintiffs Harvey and Nielsen first filed a complaint against the defendant companies in March 1974. This complaint, as amended in January of 1975, sought recovery in three counts. Count I alleges, Inter alia, a conspiracy in restraint of trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. Count II alleges violation of Idaho Code § 28-2-615 (corresponding to § 2-615 of the Uniform Commercial Code), which pertains to a seller's duty to allocate supplies to customers under a contract of sale; Count III charges tortious interference with contractual and business arrangements alleged to exist between plaintiffs and Wholesale.
 
 
 8
 The defendants moved for summary judgment in July 1974, supporting their motion with affidavits pursuant to F.R.Civ.P. 56. Plaintiffs filed counter-affidavits. In addition, both parties have taken depositions and have filed subsequent affidavits and counter-affidavits.
 
 
 9
 In a partial summary judgment order of September 5, 1975, the district court granted the defendant companies' motion for summary judgment on the Count I (Sherman Act) claim, but allowed the other two counts of the amended complaint to remain on the merits. Harvey and Nielsen appealed from the partial summary judgment and both parties briefed the Sherman Act issue for this court. However, on February 3, 1977, this court dismissed the appeal for lack of a final order in the district court, remanding the matter for disposition of the remaining two counts. On June 10, 1977, the district court entered a final judgment in favor of defendants on these counts, and this appeal followed.
 
 
 10
 In accordance with this court's order of February 3, 1977, the parties utilized their briefs prepared in the first appeal for their Sherman Act claim in this second appeal. Both parties, in addition, briefed on this appeal the issues arising under Count II. Plaintiffs did not pursue their Count III claim in briefs or at oral argument on this appeal.
 
 
 11
 II. SHERMAN ACT CLAIM: INTRA-ENTERPRISE CONSPIRACY
 
 
 12
 Plaintiffs allege that the defendant companies' course of conduct during the period of fuel shortage constituted a "combination or conspiracy in restraint of trade" prohibited by § 1 of the Sherman Act.[2] To prevail on this claim under § 1, plaintiffs ultimately would have to prove that the restraint alleged was an unreasonable one.[3] First, however, they must surmount the threshold hurdle of showing a combination or conspiracy. Defendants argue that plaintiffs have not passed this threshold.
 
 
 13
 a. Factual Issues
 
 
 14
 The parties do not dispute the following facts: that the incorporators of all the defendant corporations are the same; that Farris C. Lind is the sole shareholder, President and Board Chairman of Wholesale and of all the Retail Companies; that Lind, his wife Virginia, and Neal R. Olson are the directors of each of these corporations; that Olson is Executive Vice President and General Manager of each corporation; that Virginia Lind has never taken an active part in management of the corporations; and that accounting convenience and tax benefits were the original reasons for doing business through separate corporations.
 
 
 15
 However, plaintiffs argue that there is at least a genuine issue of fact as to whether two or more persons participated in the decision to cut off supplies to them in 1973. An affidavit of Mr. Olson, dated July 2, 1974, states:
 
 
 16
 "From the inception of each of the Defendant corporations and of all other business affairs of Farris C. Lind, (Lind) has been and remains the sole party who has made all business decisions, including policy, customer relations, source of supply and customers to whom the products shall be sold. . . . Neal R. Olson has had the responsibility of the day-to-day implementation of the business decisions and policies as set by Farris C. Lind."
 
 
 17
 Similarly, an affidavit of Mr. and Mrs. Lind, dated February 6, 1975, declares that "Lind is in total and complete control of each of the (defendant) corporations," and specifically that the decision to discontinue supplies to plaintiffs "was a decision made solely by Farris C. Lind," which Lind only subsequently communicated to Mr. Olson.
 
 
 18
 In an affidavit of September 23, 1974, in an affidavit of August 12, 1975, and in a deposition of January 16, 1975 plaintiff Harvey made statements the substance of which was as follows: that during several years of extensive dealings with Wholesale, Mr. Harvey had always conducted business directly with Mr. Olson and never with Mr. Lind; that Mr. Olson had often made on-the-spot sale agreements with Mr. Harvey and had promised not to cut off plaintiffs' supplies in the event of a gasoline shortage;[4] that it was Mr. Olson who advised plaintiffs that Wholesale would not make further deliveries of gasoline in 1973; that neither then nor at any other time was Mr. Harvey informed that Mr. Lind had made the decision or policy which Mr. Olson was carrying out; that Mr. Olson was highly skilled and experienced in the petroleum industry, while Mr. Lind was (in 1975) sick and unable to move freely about. Plaintiffs also point to a deposition taken from Mr. Olson on March 7, 1977,[5] wherein he states that he informed customers by telephone as to availability of supplies during the shortage months. In addition, plaintiffs note the provision for three directors under the defendant companies' articles of incorporation and under Idaho Code § 30-139, and urge that the decision to refuse to deal with plaintiffs must necessarily have been made by all three directors.
 
 
 19
 Since this case is here on appeal from summary judgment, this court must determine whether plaintiffs have raised a genuine issue of material fact within the meaning of F.R.Civ.P. 56(c). We are mindful of the Supreme Court's admonitions that "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot," Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); See Norfolk Monument Co. v. Woodlawn Memorial Gardens, Inc., 394 U.S. 700, 704, 89 S.Ct. 1391, 22 L.Ed.2d 658 (1969); and that on summary judgment motions "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion," United States v. Diebold, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); See Mutual Fund Investors v. Putnam Management Co., 553 F.2d 620, 624 (9th Cir. 1977); United States v. Perry, 431 F.2d 1020, 1022 (9th Cir. 1970). Nevertheless, the Poller case, Supra, is not an insurmountable barrier to summary disposition of antitrust complaints, as the Supreme Court later emphasized when it granted summary judgment in First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). Accordingly, this court has adopted the following rule:
 
 
 20
 "Once the allegations of conspiracy made in the complaint are rebutted by probative evidence supporting an alternative interpretation of a defendant's conduct, if the plaintiff then fails to come forward with specific factual support of its allegations of conspiracy, summary judgment for the defendant becomes proper."
 
 
 21
 Mutual Fund Investors, supra, 553 F.2d at 624, quoting ALW, Inc. v. United Airlines, Inc., 510 F.2d 52, 55 (9th Cir. 1975).
 
 
 22
 Here the defendants have presented probative evidence that only a single person, Mr. Lind, made the decision to refuse to deal with certain customers of Wholesale. We can find no "specific factual support," either direct or inferential, for plaintiffs' assertions to the contrary. The fact that Mr. Lind had never dealt personally with a relatively minor customer like Mr. Harvey has no bearing on Lind's capacity to make the policy decision that such customers should be cut off in times of shortage. Likewise, although Mr. Harvey asserted in his 1975 affidavit that "Farris Lind is in poor health and is unable to move freely without assistance," this statement was in the present tense: plaintiffs produced no evidence that Mr. Lind was infirm in 1973 when the events at issue occurred, nor even that his infirmity was of the sort that would keep him from running his business. As for the fact that the Farris corporations each had three directors, to conclude therefrom that a particular policy decision made in response to a crisis was necessarily made by formal vote of the directors would be to make a legal presumption wholly at odds with reasonable factual inference.
 
 
 23
 In sum, although Mr. Olson was the conduit of communications with customers and had apparent authority to make subsidiary decisions as to purchase prices and terms of delivery, the most that can be plausibly inferred from the evidence presented is that Mr. Olson, in his capacity as general manager, carried out on a day-to-day basis the policy decisions of Farris C. Lind, the man who was sole owner and chief executive officer of Fearless Farris Wholesale. Thus, even viewing the evidence in the light most favorable to the plaintiffs, we are compelled to agree with the conclusion of the district court. Plaintiffs have failed to controvert the defendants' showing that the decision to discontinue gasoline supplies was made by Mr. Lind alone, and that this decision was only subsequently communicated to Mr. Olson for implementation.[6]
 
 
 24
 b. Intra-enterprise Conspiracy
 
 
 25
 The question of law remaining under plaintiffs' Sherman Act claim is whether a "combination or conspiracy" can be deemed to exist on the facts above, where one person is the sole owner and major decisionmaker for a group of affiliated corporations.
 
 
 26
 It is fundamental that a single person or economic entity cannot combine or conspire in isolation: there must be concerted action by a plurality of actors. E. g., Mutual Fund Investors, supra, 553 F.2d at 625; Nelson Radio & Supply Co. v. Motorola, 200 F.2d 911, 914 (5th Cir. 1952), Cert. denied, 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953); Windsor Theatre Co. v. Walbrook Amusement Co., 94 F.Supp. 388, 396 (D.Md.1950), Aff'd, 189 F.2d 797 (4th Cir. 1951); L. Sullivan, Handbook of the Law of Antitrust 323 (1977); 58 C.J.S. Monopolies § 21a, at 981, n. 66 (1948); Note, Intra-Enterprise Conspiracy Under Section 1 of the Sherman Act: A Suggested Standard, 75 Mich.L.Rev. 717 (1977). Thus it is generally accepted that there can be no conspiracy where only one corporation is involved in the alleged restraint of trade.[7] However, there has been some controversy over whether separate corporations within the same corporate family or enterprise should always be deemed to constitute the requisite plurality of actors, or whether in some circumstances a family of formally distinct corporate units should be viewed realistically as a single economic entity incapable of taking concerted action with itself.[8]
 
 
 27
 On this question of intra-enterprise conspiracy, this court has in two recent cases taken the position that the mere formality of separate incorporation is not, without more, sufficient to provide the capability for conspiracy. In Knutson v. Daily Review, Inc., 548 F.2d 795 (9th Cir. 1976), a parent corporation and its wholly-owned subsidiary published various newspapers whose operations were horizontally integrated through shared printing, staff and advertising. A single individual owned controlling interest in the parent, was President of both corporations, and publisher of all the newspapers. The corporations did not hold themselves out as competitors. In dictum this court stated that "(a)rguably on these facts the two corporate units were incapable of conspiracy as a matter of law," but that resolution of this issue was unnecessary because no restraint of trade had been shown. 548 F.2d at 803.
 
 
 28
 Similarly, in Mutual Fund Investors, supra, this court reiterated that "(s) eparate incorporation, like the lack of intraenterprise competition, is not dispositive of the (conspiracy) question." 553 F.2d at 626. There the corporations at issue were vertically integrated, as are the defendant companies in the instant case. However, there the record showed that none of the affiliated companies had "exercised its judgment approving (the principal corporation's) refusal to deal," and that no unreasonable restraint of trade had occurred. Id. at 627. In neither of these cases, therefore, was it necessary to decide definitively what additional factors are necessary before affiliated corporations will be deemed capable of conspiring together.
 
 
 29
 Nor is it necessary in the case before us. For even if the defendant corporations, acting through their officers or agents, were deemed theoretically capable of conspiring, here in fact no conspiracy, no meeting of two or more minds, occurred. As discussed above, plaintiffs produced no probative evidence that anyone other than Farris Lind sole stockholder, President and Chairman of the Board of Wholesale and the Retail Companies made the decision to refuse to deal with plaintiffs. Mr. Olson's subsequent implementation of this decision does not make him a participant in a conspiracy. He acted solely as Mr. Lind's agent, after the allegedly exclusionary decision was made; it is fundamental that an agent cannot conspire with his principal. E. g., Nelson Radio & Supply Co. v. Motorola, supra, 200 F.2d at 914-15; Rayco Mfg. Co. v. Dunn, 234 F.Supp. 593, 598 (N.D.Ill.1964).
 
 
 30
 Plaintiffs might argue that even though Mr. Lind alone made the allegedly exclusionary decision to cease deliveries, there was a constructive plurality of actors in that decision because he himself legally embodies the six corporations of which he is sole owner. However, that position is conceptually indistinguishable from the position that mere separate incorporation is alone determinative of the question of intra-enterprise conspiracy. This theory we rejected in Mutual Fund Industries and Knutson.
 
 
 31
 Moreover, even if plaintiffs could show evidence of a meeting of two or more individual "minds" in the decision to cease deliveries, they would not automatically have established a conspiracy cognizable under § 1. The courts have almost universally rejected the position that two or more directors, officers or agents acting on behalf of a single corporation can be capable of conspiring in restraint of trade, either among themselves or with their corporation. See cases cited at note 7, Supra. The "two or more minds" that meet in conspiracy must be minds representing the respective business interests of two or more corporations. The complaint in this case did not include Mr. Lind and Mr. Olson as defendants; it alleges only that the Farris Corporations conspired. But plaintiffs have produced no evidence that Mr. Lind was acting in the interests of one corporation, while his general manager was primarily concerned with another corporation. Had the two individuals conspired, both would have been acting on behalf of the same corporations. Thus here, as in Mutual Fund Industries, supra, 553 F.2d at 627, the evidence does not show that any one of the five Retail Companies, through its human agent, "exercised its judgment approving" Wholesale's refusal to deal or "colluded illegally with" Wholesale.
 
 
 32
 In sum, the district court correctly found that there was no material fact in dispute on the Sherman Act claim and that defendants were entitled to judgment on that claim as a matter of law. Although we agree that no conspiracy cognizable under Sherman Act § 1 in fact occurred on this record, we do not hold that there can never be a conspiracy in restraint of trade between corporations wholly owned and controlled by a single person. See, e. g., Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 141-42, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968) (family-owned businesses); Phi Delta Theta Fraternity v. J. A. Buchroeder Co., 251 F.Supp. 968, 980 (W.D.Mo.1966). Nor do we hold that a single common director or officer may with antitrust impunity make decisions on behalf of two or more corporations, where those corporations have antitrust significance as separate economic units. See Knutson, supra, 548 F.2d at 802 n. 4. Those questions we leave for an appropriate future appeal.
 
 
 33
 III. COUNT II: RIGHT TO APPORTIONMENT UNDER IDAHO CODE § 28-2-615
 
 
 34
 Plaintiffs contend that under Idaho Code § 28-2-615 they were entitled to an allocation of supplies during the shortage period. Section 28-2-615 (corresponding to § 2-615 of the Uniform Commercial Code) provides, in pertinent part, that where a "contingency the nonoccurrence of which was a basic assumption on which the contract was made" partially affects the capacity of a seller "under a contract for sale" to deliver to his buyer, then the seller "must allocate production and deliveries among his customers but may at his option include regular customers not then under contract as well as his own requirements for further manufacture."[9] Defendant Wholesale concedes that it made no such allocations to Harvey and Nielsen until February 1974, when the federal mandatory allocation program forced it to do so. Assuming, without deciding, that the gasoline supply shortage of 1973 constituted the sort of "contingency" envisaged by § 28-2-615, we nevertheless conclude that Wholesale did not violate the statute.
 
 
 35
 Plaintiffs argue that they were not mere "regular customers not then under contract," dependent upon the good graces of the seller for allocation under § 28-2-615; they claim to be buyers under a "contract for sale," to whom the seller had no choice but to allocate. Specifically, Mr. Harvey has claimed in his deposition that he had an oral agreement with Wholesale, made in 1967 or 1968, whereby Wholesale would supply U-Serve's total "gasoline requirements" in Idaho at a "competitive price" to be determined by the seller (Deposition of Clyde E. Harvey, Jan. 16, 1975, at 18-21). In addition, Mr. Harvey claimed that Wholesale, through Mr. Olson, gave reassurances at an oil marketer's convention in 1973 that it would continue to supply U-Serve in the event of a shortage (Id. at 24-27). Neal Olson's affidavit of February 21, 1975, on the other hand, stated that any such purported agreement was "a total fabrication."The district court, conceded, as do we, that plaintiffs have at least raised a genuine factual issue as to the existence of an agreement between the parties.[10] Therefore, we assume, for purposes of summary judgment, that the parties did in fact reach an "agreement." However, under the Uniform Commercial Code as adopted in Idaho, inquiry does not stop with this finding of fact. The question becomes whether the terms of that agreement have any legal consequences, so as to result in an enforceable legal obligation.[11] If there was no enforceable contract for sale, the claim that Wholesale had a statutory duty to allocate deliveries to U-Serve must fail.
 
 
 36
 Since it is plaintiffs who insist that an oral agreement was made, it is they who must describe what the terms of the agreement were. Mr. Harvey, when questioned in deposition, made the following admissions about his understanding of the bargain:
 
 
 37
 "Q (Mr. Carter): . . . If, under the agreement that you had with Mr. Olson which you have explained and which is in your Complaint, if, under that agreement you were able to buy gas at a cheaper price than Mr. Olson was willing to supply it were you free to make the purchase elsewhere?
 
 
 38
 "A Yes.
 
 
 39
 "Q You were free to purchase elsewhere, but they were not free to refuse to sell to you, is that correct?
 
 
 40
 "A That is correct.
 
 
 41
 "Q And if you called Mr. Olson and agreed to pay his price, asked for delivery of gasoline and offered to pay his price, and he says, 'I refuse to deliver it to you,' that was contrary to the agreement?
 
 
 42
 "A Right.
 
 
 43
 "Q Then, if I understand this correctly, You were free to seek the best bargain you could get, but at such time as you desired you could demand of him and he would have to deliver or be outside of the agreement? He would have to deliver, is this correct?
 
 
 44
 "A Yes.
 
 
 45
 "Q And that agreement was the agreement that . . . U-Serve had with these people?
 
 
 46
 "A Yes."
 
 
 47
 Deposition of Clyde E. Harvey, Jan. 16, 1975, at 39, 75-76 (emphasis added).
 
 
 48
 The district court concluded that the purported agreement lacked mutuality of obligation under these admitted terms, whereby the purchaser was free to buy elsewhere while the seller was bound at all times to sell to the purchaser. The court held that where there was no mutuality, there was no enforceable contract under Idaho contract law, as set out in McCandless v. Schick, 85 Idaho 509, 380 P.2d 893 (1963).[12] Thus, when the claimed "contract for sale" fell, so fell Harvey's and Nielsen's claim under § 28-2-615.
 
 
 49
 On appeal, plaintiffs do not dispute the district judge's reading of the Idaho case law, making mutuality of obligation a prerequisite to enforceability of most executory contracts. They dispute only the conclusion that that case law governs the type of agreement which they claim. Plaintiffs' argument rests on the second sentence in § 28-1-201(3), which provides that "(w)hether an agreement has legal consequences is determined by the provisions of (the Idaho Uniform Commercial Code), If applicable ; otherwise by the law of contracts . . ." (emphasis added). See also § 28-1-103, which provides that pre-existing law continues as a supplement to the Code, "(u)nless displaced by the particular provisions of (the Code)" (emphasis added). Plaintiffs urge (a) that § 28-2-305 (open price term)[13] is "applicable" to the arrangement they have described, thus displacing for present purposes the body of Idaho contract law relating to mutuality; and, moreover, (b) that their agreement constituted a requirements contract, which the Official U.C.C. Comment to § 28-2-306 (output, requirement & exclusive dealings)[14] expressly declares to have mutuality. We reject both these contentions.
 
 
 50
 Section 28-2-305 provides that in certain circumstances a valid "contract for sale" can be concluded "even though the price is not settled" at the time of the contract. Plaintiffs argue that the terms of agreement described in the above deposition merely reflect an understanding that Wholesale's prices would be competitive or market prices fixed in good faith, as required under § 28-2-305(2). We may assume Arguendo that if the seller failed to fix a reasonable price in good faith under § 28-2-305(2), the buyer would be entitled to "treat the contract as cancelled" pursuant to § 28-2-305(3), that is, to buy from another supplier.[15] See Anderson, Supra at 422. But a price fixed in good faith at the prevailing market level is not the same as "the best bargain you could get." The latter might include, E. g., odd lots of surplus gasoline sold at "dumping" prices, below market. Nothing in the Idaho Code's definitions of good faith, §§ 28-1-201(19)[16], -2-103(1)(b)[17], imposes an implicit requirement for a seller to match the lowest price available. Nor do plaintiffs contend that Wholesale expressly undertook to offer such prices. In sum, it appears that the provisions for "good faith" in § 28-2-305 do not make that section "applicable" to the terms of a purported agreement whereby buyer was free to buy from others if seller would not match their prices, while seller was bound to fill buyer's requirements whenever buyer so demanded. The elastic in the term "good faith" should not stretch so far.
 
 
 51
 Nor does this purported arrangement constitute a requirements contract within the purview of § 28-2-306. It is elementary that a requirements contract is one in which the buyer "expressly or implicitly promises he will obtain his goods or services from the (seller) Exclusively." Bank of America Nat'l. Trust & Savings Ass'n v. Smith, 336 F.2d 528, 529 n. 1 (9th Cir. 1964) (emphasis added); See e. g., Lowell O. West Lumber Sales v. United States, 270 F.2d 12, 17 (9th Cir. 1959); Propane Industrial, Inc. v. General Motors Corp., 429 F.Supp. 214, 218 (W.D.Mo.1977); In re United Cigar Stores Co., 8 F.Supp. 243 (S.D.N.Y.), Aff'd, 72 F.2d 673 (2d Cir. 1934); Shader Contractors, Inc. v. United States, 276 F.2d 1, 4, 149 Ct.Cl. 535 (1960); 1A A. Corbin, On Contracts § 157 (2d ed. 1963); 1 S. Williston, On Contracts § 104A (3d ed. 1957); Note, Requirements Contracts: Problems of Drafting and Construction, 78 Harv.L.Rev. 1212, 1213 (1965). Yet in this case plaintiffs have expressly stated that the purported agreement permitted them to purchase an indefinite portion of their supplies from sellers other than Wholesale. Such an arrangement would not entail a promise to buy U-Serve's Idaho gasoline requirements from Wholesale, but merely to buy from Wholesale when it was advantageous to do so. Again, the provision for "good faith" in § 28-2-306 cannot stretch the statute to make such a one-sided executory agreement enforceable.[18]
 
 
 52
 In sum, plaintiffs have not shown the Idaho Uniform Commercial Code to be "applicable" to the peculiarly convenient arrangement they claim. We agree with the district court that the Idaho rules requiring mutuality of obligation thus govern and make that arrangement unenforceable. Therefore, there is no basis for the claim in Count II.
 
 
 53
 The Amended Final Summary Judgment filed June 10, 1977, will be affirmed.
 
 
 
 *
 The Honorable Francis L. Van Dusen, Senior Circuit Judge for the Third Circuit
 
 
 [1]
 The district court also ruled against plaintiffs' claim of tortious interference with contractual and business relations; this ruling was not appealed
 
 
 [2]
 Section 1 of the Sherman Act, 15 U.S.C. § 1 (Supp. V, 1977) provides in pertinent part:
 "Every contract, combination . . ., or conspiracy, in restraint of trade or commerce among the several States . . . is declared to be illegal. . . ."
 
 
 [3]
 E. g., Alpha Distributing Co. v. Jack Daniel Distillery, 454 F.2d 442, 452 (9th Cir. 1972). Since we dispose of this case on other grounds, we need not discuss plaintiffs' prospects for proving an unreasonable restraint of trade on the facts of this case
 
 
 [4]
 Defendants vigorously deny making any promise to continue deliveries in the event of a shortage. See p. 458, Infra. For purposes of this motion for summary judgment, however, we accept plaintiffs' version of this fact as true
 
 
 [5]
 This deposition was not before the district court when it disposed of plaintiffs' Count I (Sherman Act) claim in its Partial Summary Judgment order of September 5, 1975. However, that order did not preclude gathering of further evidence on this claim, under the procedural circumstances of this case. F.R.Civ.P. 54(b) provides that "an express determination that there is no just reason for delay" and "an express direction for the entry of judgment" are necessary for an adjudication of one or more, but fewer than all, of the claims in an action to be final
 "In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims . . . Is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties." (Emphasis added.)
 As this court's Memorandum and Order of Dismissal of February 3, 1977, points out, no such determination had been sought or granted as to Count I. Nor does such a determination appear in the record prior to entry of the district court's Amended Final Summary Judgment, which expressly directed entry of final judgment on Count I as well as on Counts II and III. Therefore, since the 1975 partial summary judgment on Count I would have been subject to revision under F.R.Civ.P. 54(b) at the time of the 1977 Olson deposition, this deposition may properly be considered in connection with the Count I claims.
 
 
 [6]
 Mr. Harvey, in his deposition of January 16, 1975, at 64-65, conceded that he had no specific knowledge of any meeting or discussion among officers or directors of the defendant corporation, but that he based his allegation of conspiracy on "results." Also, Mr. Nielsen admitted the following in his deposition of the same day, at 15:
 "I don't know if there was such a meeting; I doubt if it was necessary.
 I believe (Lind) pretty much controls his company. I don't believe he would discuss it with the Board of Directors what he was going to do or whether people were delegated to handle his business were going to do."
 (Emphasis added.)
 At a later date, in his affidavit of August 12, 1975, Mr. Harvey asserted "(t)hat it would be incredible to believe that Farris Lind or anyone else connected with the defendant corporations would . . . decide to terminate supply arrangements with any customers without first having consulted or conferred with Neal R. Olson." We agree with the district court that the plaintiffs' mere assertion of disbelief in defendants' affidavits is insufficient to raise a genuine issue of fact. See Strickland v. Watt, 453 F.2d 393, 395 (9th Cir. 1972). Plaintiffs did not choose to depose defendants' affiant, Mr. Olson, until 1977 and did not then choose to cross-examine him on his statement that Mr. Lind was the sole party who made all business decisions.
 
 
 [7]
 Two or more individual officers, directors or agents within a single corporation, acting on behalf of that corporation, are considered incapable of conspiring with each other or with their corporation, for § 1 purposes. E. g., Chapman v. Rudd Paint & Varnish Co., 409 F.2d 635, 643 n. 9 (9th Cir. 1969); Goldlawr, Inc. v. Shubert, 276 F.2d 614, 617 (3d Cir. 1960); Nelson Radio & Supply Co. v. Motorola, Inc., supra, 200 F.2d at 914; See Report of the Attorney General's National Committee to Study the Antitrust Laws 30-36 (1955). Nor can separate divisions within a single corporation conspire. Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71 (9th Cir. 1969), Cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970)
 
 
 [8]
 In certain cases, the Supreme Court has declared, the affiliated corporations are deemed capable of conspiring in restraint of trade: "common ownership and control does not liberate (corporations) from the impact of the antitrust laws . . . especially . . . where (they) hold themselves out as competitors." Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 215, 71 S.Ct. 259, 261, 95 L.Ed. 219 (1951) (wholly-owned subsidiaries); Accord, Perma Life Mufflers v. Int'l Parts Corp., 392 U.S. 134, 141-42, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968) (parent and wholly-owned subsidiary); Timken Roller Bearing Co. v. United States, 341 U.S. 593, 598, 71 S.Ct. 971, 95 L.Ed. 1199 (1951) (parent and partially-owned subsidiary); Schine Chain Theatres, Inc. v. United States, 334 U.S. 110, 68 S.Ct. 947, 92 L.Ed. 1245 (1948) (§ 2 liability also found); United States v. Yellow Cab Co., 332 U.S. 218, 227, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947) (parent and partially-owned subsidiaries). Some lower federal courts have taken the position that the prerequisites of a § 1 conspiracy can be met by the mere presence of two or more legally distinct corporations. E. g., Columbia Metal Culvert Co. v. Kaiser Aluminum & Chemical Corp., 579 F.2d 20, 33-34 and n. 49 (3d Cir. 1978), Cert. denied, --- U.S. ----, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978); Glauser Dodge v. Chrysler Corp., 570 F.2d 72, 81 n. 3 (3d Cir. 1977), Cert. denied, 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 413 (1978); Cromar Co. v. Nuclear Materials Equip. Corp., 543 F.2d 501, 511-12 (3d Cir. 1976); Handgards, Inc. v. Johnson & Johnson, 413 F.Supp. 921, 926 (N.D.Cal.1976). This court has recently rejected such a rule. Mutual Fund Investors, supra, 553 F.2d at 625-26; Knutson v. Daily Review, Inc., 548 F.2d 795, 802 (9th Cir. 1976)
 The Supreme Court has never stated definitively how broad in scope the theory of intra-enterprise conspiracy should be, and the theory has been subjected to much criticism and comment. See, e. g., P. Areeda, Antitrust Analysis P 338 (2d ed. 1974); Handler, Twenty-Five Years of Antitrust, 73 Colum.L.Rev. 415, 452-53 (1973); Handler, Through the Antitrust Looking Glass Twenty-First Annual Antitrust Review, 57 Calif.L.Rev. 182, 182-86 (1969); Willis and Pitofsky, Antitrust Consequences of Using Corporate Subsidiaries, 43 N.Y.U.L.Rev. 20 (1968); McQuade, Conspiracy, Multicorporate Enterprises, and Section 1 of the Sherman Act, 41 Va.L.Rev. 183 (1955); Note, Intra-Enterprise Conspiracy Under Section 1 of the Sherman Act, 75 Mich.L.Rev. 717 (1977); Comment, All in the Family: When Will Internal Discussions Be Labelled Intra-Enterprise Conspiracy?, 14 Duq.L.Rev. 63 (1975) (hereinafter All in the Family ).
 In an attempt to limit the reach of the doctrine of intra-enterprise conspiracy, some lower federal courts have identified exceptions to it. For example, it has been held that no combination or conspiracy exists where the affiliated corporations do not hold themselves out as competitors, E. g., Ark Dental Supply Co. v. Cavitron Corp., 461 F.2d 1093, 1094 n. 1 (3d Cir. 1972) (dictum); Call Carl, Inc. v. BP Oil Corp., 403 F.Supp. 568, 572-73 (D.Md.1975), Aff'd on this issue, 554 F.2d 623, 628 (4th Cir.), Cert. denied, 434 U.S. 923, 98 S.Ct. 400, 54 L.Ed.2d 280 (1977); Beckman v. Walter Kidde & Co., 316 F.Supp. 1321, 1326 (S.D.N.Y.1970), Aff'd per curiam, 451 F.2d 593 (2d Cir.), Cert. denied, 408 U.S. 922, 92 S.Ct. 2488, 33 L.Ed.2d 333 (1972); or where the concerted action between the affiliated corporations restrains no outsider's trade, E. g., REA Express, Inc. v. Alabama Great Southern R. Co., 427 F.Supp. 1157 (S.D.N.Y.1976), Aff'd mem. sub nom. Sowerwine, Trustee in Bankruptcy v. United States, 431 U.S. 961, 97 S.Ct. 2914, 53 L.Ed.2d 1057 (1977); In re Penn Central Securities Litigation, 367 F.Supp. 1158, 1166-67 (E.D.Pa.1973); See Report of the Attorney General's National Committee to Study the Antitrust Laws 34 (1955); or where there is no anticompetitive motive for the separate corporate status of the defendants, E. g., I. Haas Trucking Corp. v. New York Fruit Auction Corp., 364 F.Supp. 868, 873 (S.D.N.Y.1973) (separate incorporation solely to accommodate separate unions); or where the affiliated corporations are for practical purposes "a single business unit," E. g., Giant Paper & Film Corp. v. Albemarle Paper Co., 430 F.Supp. 981, 985-86 (S.D.N.Y.1977); Beckman, supra, 316 F.Supp. at 1326; See Knutson v. Daily Review, Inc., 548 F.2d 795, 801 (9th Cir. 1976).
 The limitation on the intra-enterprise conspiracy doctrine which is most pertinent to the case at hand has been dubbed the "one-man show" exception, holding that affiliated corporations owned and controlled by a single individual are not capable of conspiring in restraint of trade. Comment, All in the Family, supra at 85-87. While the court in Rayco Mfg. Co. v. Dunn, 234 F.Supp. 593, 598 (N.D.Ill.1963), may have held that corporations owned and controlled by a single person cannot conspire as a matter of law (just as a single corporation as a matter of law cannot conspire with itself), other decisions involving "one-man" enterprises have rested on the fact that the sole owner was also the sole decisionmaker in the action of which complaint is made. See the district court decision in Knutson v. Daily Review, Inc., 383 F.Supp. 1346 (N.D.Cal.1974); Windsor Theatre Co. v. Walbrook Amusement Co., 94 F.Supp. 388 (D.Md.1950), Aff'd, 189 F.2d 797 (4th Cir. 1951). We need only follow the latter course in the case at hand, thus not precluding a finding of conspiracy in a one-man enterprise on other facts.
 
 
 [9]
 The full text of the statute is as follows:
 "Excuse by failure of presupposed conditions. Except so far as a seller may have assumed a greater obligation and subject to the preceding section on substituted performance:
 "(a) Delay in delivery or nondelivery in whole or in part by a seller who complies with paragraphs (b) and (c) is not a breach of his duty under a Contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made or by compliance in good faith with any applicable foreign or domestic governmental regulation or order whether or not it later proves to be invalid.
 "(b) Where the causes mentioned in paragraph (a) affect only a part of the seller's capacity to perform, he must allocate production and deliveries among his customers but may at his option include regular customers Not then under contract as well as his own requirements for further manufacture. He may so allocate in any manner which is fair and reasonable.
 "(c) The seller must notify the buyer seasonably that there will be delay or nondelivery and, when allocation is required under paragraph (b), of the estimated quota thus made available for the buyer."
 (Emphasis added.)
 
 
 [10]
 Section 28-1-201(3) of the Idaho Code defines "agreement" in broad terms:
 " 'Agreement' means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this act . . . ."
 See also § 28-2-204 (formation of contract for sale). According to the definition in § 28-2-106(1), the agreement may relate to the future sale of goods as well as a present sale. Under these broad provisions, and in light of the parties' dealings over several years, See § 28-1-205 (course of dealing); § 28-2-208 (course of performance), it is at least an issue of fact whether there existed an actual "agreement" relating to the future sale of gasoline.
 
 
 [11]
 Section 28-1-201, presenting general definitions, provides, in pertinent part:
 "(3) . . . Whether an agreement has legal consequences is determined by the provisions of this act, if applicable; otherwise by the law of contracts (section 28-1-103). (Compare 'Contract').
 "(11) 'Contract' means the total legal obligation which results from the parties' agreement as affected by this act and any other applicable rules of law. (Compare 'Agreement.')"
 Thus the Code distinguishes between the fact that a bargain is struck, and the transubstantiation of that fact into a legal obligation by operation of governing law. See 1 R. Anderson, Uniform Commercial Code 73, 88, 234 (2d ed. 1970).
 
 
 [12]
 In McCandless, the Supreme Court of Idaho summarized the requirement of mutuality as follows:
 "That mutuality of obligation is an essential element of a contract has been recognized repeatedly by this court. (Citations omitted.) Mutuality of obligation as pertains to an executory contract requires that each party to the agreement be bound to perform; if it appears that one party was never bound on his part to do the acts which form the consideration for the promise of the other, there is a lack of mutuality of obligation, and the other party is not bound."
 
 
 [85]
 Idaho at 518, 380 P.2d at 898; See Kays v. Brack, 350 F.Supp. 1243, 1245 (D.Idaho 1972); Green v. Beaver State Contractors, Inc., 93 Idaho 741, 743, 472 P.2d 307, 309 (1970). See also Willard Sutherland Co. v. United States, 262 U.S. 489, 493, 43 S.Ct. 592, 67 L.Ed. 1086 (1923) (contract for the purchase of coal by the Government which does not require the Government to take, or limit its demand to, any ascertainable quantity, is unenforceable for lack of mutuality)
 
 
 [13]
 Section 28-2-305 provides:
 "(1) The parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time for delivery if
 "(a) nothing is said as to price; or
 "(b) the price is left to be agreed by the parties and they fail to agree; or
 "(c) the price is to be fixed in terms of some agreed market or other standard as set or recorded by a third person or agency and it is not so set or recorded.
 "(2) A price to be fixed by the seller or by the buyer means a price for him to fix in good faith.
 "(3) When a price left to be fixed otherwise than by agreement of the parties fails to be fixed through fault of one party the other may at his option treat the contract as canceled or himself fix a reasonable price.
 "(4) Where, however, the parties intend not to be bound unless the price be fixed or agreed and it is not fixed or agreed there is no contract. In such a case the buyer must return any goods already received or if unable so to do must pay their reasonable value at the time of delivery and the seller must return any portion of the price paid on account."
 
 
 [14]
 Section 28-2-306 provides, in pertinent part:
 "(1) A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded."
 
 
 [15]
 Mr. Harvey's deposition, Supra at 21, indicates that the seller was to fix the price under the agreement, although the second Brief of Appellants, at 15, states that prices were to be "agreed upon by the parties." Under the latter position, if subsequent agreement between the parties could not be reached because of bad faith offers or bargaining by the seller, it would appear that "the failure to determine the price in the manner specified (would) not affect the contract," Anderson, Supra at 423; i. e., buyer would be entitled only to a "reasonable price" as determined by a court, not to termination of the contract
 
 
 [16]
 Section 28-1-201(19) provides:
 " 'Good faith' means honesty in fact in the conduct or transaction concerned."
 
 
 [17]
 Section 28-2-103(1)(b) provides:
 " 'Good faith' in the case of a merchant means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade."
 
 
 [18]
 Examination of Official U.C.C. Comment 2 to § 28-2-306 indicates that the "good faith" requirement relates solely to the quantity of goods demanded, not to any purported right to fill one's demands elsewhere